UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JAN HARRIS, et al., individually and on behalf of others similarly situated, | § § § | |
| Plaintiffs, | § | |
| v. | § | CIVIL ACTION NO. 4:07-cv-3938 |
| | § | |
| AUXILIUM PHARMACEUTICALS, INC., | § § | |
| | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Before the Court are Plaintiffs' Motion to Certify Class (Doc. No. 54), Defendant's Motion to Extend Time to Respond to Plaintiff's Motion to Certify Class (Doc. No. 55), Defendant's Motion for Summary Judgment (Doc. No. 76), Motion to Strike Plaintiffs' Summary Judgment Evidence and for Sanctions (Doc. No. 85), and Defendant's Motion to Exceed Reply Page Limit (Doc. No. 87). After considering the parties' filings and the applicable law, the Court finds that Defendant's Motion to Strike and for Sanctions should be granted in part and denied in part, Defendant's Motion to Exceed Reply Page Limit should be granted, Defendant's Motion for Summary Judgment should be granted in part and denied in part, Plaintiffs' Motion for Conditional Class Certification should be denied as moot, and Defendant's Motion to Extend Time to Respond to Plaintiffs' Motion to Certify Class should be denied as moot.

## I.    BACKGROUND

This dispute arises out of Plaintiff Jan Harris's employment with Defendant Auxilium Pharmaceuticals, Inc. ("Auxilium").[1] Defendant is a specialty biopharmaceutical company that targets patient populations with unmet medical needs and focuses on developing and marketing to urologists, endocrinologists, orthopedists and select primary care physicians.  (Susan Roberts Aff. ¶ 2, Doc. No. 77, Ex. A.)  Defendant markets Testim 1% ("Testim"), a topical testosterone gel for the treatment of hypogonadism, and has several projects in clinical development.  (*Id.* at ¶ 3.)

### A. Medical Sales Consultants

Jan Harris began working for Defendant on or about January 29, 2003 as a Medical Sales Consultant ("MSC").  (Doc. No. 77, Ex. B1.)  Kathy Parks began working for Defendant as an MSC on a part-time basis in December 2002.[2]   Parks became a full-time MSC on February 1, 2003.  (Parks Dep. 31, Feb. 2, 2009.)

MSCs are responsible for developing relationships with pharmacies and doctors in different therapeutic areas.  (*Id.* at 43:1-19.) MSCs develop a rapport with physicians and office staff in order to gain and improve their access to the office.  (*Id.* at 44:23-45:3.) MSCs must have good product knowledge of Testim in order to promote its features and benefits.  (*Id.* at 45:25-46:3.)  MSCs use sales data, provided by Defendant, and in some cases show it to physicians to increase sales.  (*Id.* at 51.)  They are required to bring promotional materials with them to the doctor's office, but they use these materials at their discretion.  (Hatten Dep. 59:1-60:8, Jan. 13, 2009.)  If a doctor has a medical question that is not addressed by Defendant's promotional materials, the MSC must direct the question to Defendant's Medical Affairs Department.  (*Id.* at 64:22-25.)   They bring "detail pieces" which are distributed by Defendant's marketing

---

[1] For the purpose of this Motion only, the facts will be presented in the light most favorable to Plaintiffs.
[2] As will be discussed *infra*, the parties dispute to what extent Kathy Parks is a party to this lawsuit.

department, and Defendant recommends that the MSCs discuss the detail piece within the first ten seconds of their meeting with the physician. (*Id.* at 60:1-25.) MSCs are graded in their evaluations as to whether they satisfy this objective. (*Id.* at 62:6-16.) They are expected to discuss with the physician any problems he might have with Testim. (*Id.* at 50:11-17.)

MSCs "brand" the doctor's office by leaving pens and educational material after their calls. (*Id.* at 60:1-13.) It is a violation of Defendant's policies for MSCs to use unapproved materials to promote Testim. (Kessig Dep. 167-168, Jan. 20, 2009.) MSCs are also responsible for planning speaker programs once a month, picking a physician from an approved list and inviting certain physicians from their territories to attend. (Parks Dep. 72-74.)

MSCs are expected to "close the sale" by detailing the product, getting an agreement from the doctor to use the product, and then conclude with a "call for action "and follow-up. The doctor's commitment to use the product is not put into writing, and the doctor may chose not to take the agreed upon action once the MSC leaves the office. (Kessig Dep. 167-168.) MSCs cannot enter into binding contracts with the physicians or negotiate the purchase price for Testim. No money is exchanged when MSCs "close the sale." (Hatten Dep. 67:24-69:21.)

Defendant gives MSCs a list of physicians to contact, including the physician's specialty and demographic information. (Parks Dep. 34:1-9.) MSCs are restricted from seeing doctors other than those whose names Defendant provides. (*Id.* at 27:1-4.) MSCs also call on pharmacies to persuade them to stock Testim. (*Id.* at 26:12-13.) Defendant determines an MSC's territory, which encompasses the doctors and pharmacies she is required to visit.[3] MSCs are required to live in the territory they are hired to serve. (Harris Dep. 55:19-56:5, Feb. 10, 2009.) The geographic size of the territories varies, but each has roughly the same number of

---

[3] Harris's territory was titled "North Houston." (Harris Dep. 56:16-17.)

3

doctors.  (*Id.*)  MSCs cannot call on doctors outside of their assigned territory.  (Hatten Dep. 47:1-3.)

MSCs do not have an office—instead, Defendant provides them with a car or vehicle reimbursement, a laptop computer, and a Dell Axiom, a handheld computer.  It is up to the MSC to decide where to conduct business.  (Harris Dep. 22:14-17.)  MSCs record on their handheld computers which physicians they visit and when.  (*Id.* at 65:22-25.) Every quarter MSCs must provide their RSDs with "routing schedules" that break down their daily cycle of which doctors they will call on each day.  These are "breathing documents" and MSCs do not have to follow them exactly (Hatten Dep. 54:18-23.)  Defendant gives MSCs guidelines about the number of physicians they should visit and the percentage of doctors MSCs should visit in a particular amount of time.  (Hatten Dep. 56:1-10.)  MSCs are evaluated on their ability to satisfy these guidelines.  (*Id.* at 57:5-9.)  Defendant recommends that MSCs call on doctors prescribing the most Testim, and that they call on them at least once per week.  (Hatten Dep. 52:11-52:25.)  If an MSC fails to call on these doctors frequently, such failure could result in a lower field coaching report from her supervisor.  (*Id.* at 53:16.)  Furthermore, Defendant recommends that MSCs call on at least two pharmacies per week.  (*Id.* at 54:6-10.)  MSCs are paid incentive compensation and would receive contest awards based on the number of prescriptions that are written in their territory.  (Parks Dep. 54:12-17.)

When she visited doctors, Harris would occasionally be accompanied by her Regional Sales Director ("RSD"), Jeffrey Hatten, or Mark Mosebook, who worked in Defendant's corporate headquarters.  (Harris Dep. 59-60; 21:6-12.)  Most of the time Harris was working, however, she would visit doctors alone.  (*Id.* at 59:14-15.)  Sometimes Hatten would go months without accompanying Harris on her visits.  (*Id.* at 62:12-15.)  Harris did not keep track of how

many hours per week she worked.  (*Id.* at 62:21-25.)  MSCs were advised, however, that it was "not a forty hour workweek" and that they should be in the field between 8:00 a.m. and 9:00 a.m., and that they should make their last call between 4:00 p.m. and 5:00 p.m.   After driving home, Harris would sync her handheld computer, review emails, and occasionally do dinner programs or travel.  (*Id.* at 63:1-15.)  Harris estimates that she worked anywhere from sixty to seventy-five hours per week.  (*Id.* at 67:1-8.)  Her hours and work schedule varied from week to week.  (*Id.* at 68:17-18.)  Parks estimates that she worked anywhere from 60-70 hours per week, and she never reported to Defendant how many hours she worked in a particular week.  (Parks Dep. 77:19-78:14.)

Harris understood her primary function to be to take the information she had received in training and deliver it to physicians.  (Harris Dep. 21:21-24.)   From time to time, MSCs are required to prepare a document entitled a "Monthly Business Summary."  (*Id.* at 38:6-11.)  The document has a section labeled "Significant Issues" in which the MSC, in consultation with her supervisor, discusses issues she is having in the field.  (*Id.* at 38:18-39:10.)  Harris's Monthly Business Summaries indicate that, in one instance, after bringing a particular physician coffee and learning from his staff that he liked it, Harris continued to bring him coffee.  (*Id.* at 57:4-25.)  Harris commented that another physician "will be a good thought leader if he can make time to speak."  (*Id.* at 58:9-16.)   The document indicates that, on occasion, Harris would meet with particular physicians to discuss why they had stopped writing prescriptions for Testim.  (*Id.* at 40:8-10.)  Harris acknowledges that intelligence played some role in her success as an MSC, because "doctors can recognize if they are dealing with a person with some intelligence of some sort."  (*Id.* at 178:14-17.)  Harris claims that, in 2006, in the North Houston territory, she helped Defendant achieve a 31 percent market share.  She acknowledges that this was due in part to her

efforts and in part to the clinical trials and "detail pieces" she received from Defendant. (*Id.* at 183:14-18.)  However, at one point in her deposition, Harris testified that her role was limited to "handing out pens and the table paper" that Defendant provided. (*Id.* at 184:22-25.)

Parks, in describing her calls, testified that she would usually walk into the doctor's office because she "had a very good rapport with doctors, and they knew me."  She would tell them about the benefits of the drug, but she stated that she usually did not have to because they knew her so well.  She would inquire if they needed vouchers or samples. (*Id.* at 27:8-17.)  Because Testim is a controlled substance, MSCs cannot carry samples of it, but they do have sample request forms that physicians sign. (*Id.* at 28:8-25l Hatten Dep. 57:14-58:8.)  Once an MSC gets a commitment from a doctor to use the Testim, she has the doctor sign the form. (Kessig Dep. 165:12-15.)  MSCs later fax the sample forms to be processed by Defendant's corporate headquarters. (Parks Dep. 28:8-25.)  Parks testified that Defendant did not like to distribute samples, because it would rather have the doctor write a prescription, but that she continued to give out the sample forms because "doctors like samples." (*Id.* at 30-31.)  Parks further testified that sometimes she did not fax in the sample request form, but instead just got the doctor to sign the form so that she would have an opportunity to talk to him. (*Id.*)  Parks would also buy candy for the doctors because it would help her gain entry into the office. (*Id.* at 36:12-20.) According to Parks, while the handheld computer did track when the MSCs visited physicians, it did not track other activities, such as time spent at dinner meetings or buying candy for physicians. (*Id.* at 38.)  For instance, the handheld computer recorded when Parks began work every day, but it did not indicate when she finished work because she could still do work, such as faxing and email, after she synced her handheld device. (Parks Dep. 42:19-24.) The company provided MSCs with sales aid, but Parks did not always use the aids because "it was a

difficult thing to pull out every time you went there when you knew the doctor so well." (*Id.* at 47:1-10.)

When asked in which cases she would show a doctor sales data, Parks responded that she would possibly show it if a doctor asked for it, but that "[y]ou can't walk into a doctor's office and show them every piece of documents that you have in your bag. There's not that much time. I don't know about you, but if you're seeing a doctor as a patient, you don't want a rep to sit there and take up all the time." (*Id.* at 52:1-7.) Parks testified that MSCs are required to call on a specific number of doctors every day, but that it "depended on a lot of different things." (*Id.* at 57:1-5.) Parks' Monthly Business Summary for January 2006 indicates that she "changed [her] strategy and informed the nurses and MA about the voucher card and its benefits for their patients. Samples still seem to be a greater asset in this territory." (*Id.* at 65:5-9.) Parks would also arrange events with physicians, like a breakfast at the Village Family Practice. (*Id.* at 67:16-25.)

### B.  Jan Harris's Employment with Auxilium

Harris worked as an MSC from January 29, 2003 to October 2, 2007.  (Doc No. 84, Ex. F ¶ 5.)  In 2004, Defendant employed 132 MSCs.  Of those, approximately 31 were over the age of forty.  (*Id.*)  In 2005, Defendant employed 125 MSCs.  Of those, 33 (or approximately 27 percent) were over the age of forty.  Of the 33 MSCs over the age of forty, 14 were female.  In 2006, Defendant employed 187 MSCs.  Of those, 49 (or approximately 27 percent) were over the age of 40.  Of the 49 MSCs over the age of 40, 25 were female.  Finally, in 2007, Defendant employed 182 MSCs.  Of those, 69 (or approximately thirty eight percent) were over the age of 40.  Of the MSCs over the age of 40, 37 were female. (*Id.*)[4]

---

[4] As Defendant points out in its Reply, Plaintiffs have not advanced failure to hire claims.

Harris received many accolades during her career as an MSC.  In 2003, Defendant ranked Harris # 11 out of 75 MSCs, and in 2004, Defendant ranked Harris #6 out of 131 MSCs and awarded her the company's prestigious "President's Club" award. (*Id.* at ¶¶ 6-7.) In 2005, Defendant ranked Harris # 14 out of 125 MSCs. (*Id.* at ¶ 8.)

In early 2005, Jeffrey Hatten was hired as RSD for the Lone Star Region and became Harris's supervisor.  (Harris Dep. 49:6-7.)  Eleven MSCs reported directly to Hatten.  (Hatten Dep. 43:1.)  According to Harris, Hatten "preferred to work with men."  For instance, some male MSCs with lower sales quotas than Harris would accompany Hatten to a hunting store because Hatten liked to hunt.  (Harris Dep. 48:1-49:5.)  During her first "ride-along" with Hatten, he asked Harris what type of doctors were in her region.[5]  She explained that she had a large HIV physician base because people who suffered from HIV were often hypogonadal.  (*Id.* at 49-50.) Hatten asked Harris if these doctors were typically homosexual, and Harris responded that they were.  (*Id.* at 50:7-12.)  At that point in the ride-along, Harris had arrived at a hospital they were going to visit, and Hatten began to quote Bible verses to Harris and tell her that "homosexuals and gays will go to hell."  (*Id.* at 50-13.)  Harris then explained to Hatten that her brother, who was gay, had been killed by AIDS. (*Id.* at 50-51.)  Hatten informed Harris that he wanted to tell her about Billy Graham and his personal religious beliefs.  Hatten explained that Billy Graham taught that in order to have a strong marriage, it was important for a man not to be alone with members of the opposite sex, ever, except for his wife.  Hatten told Harris that "this presented a problem to him." (*Id.* at 52:1-8.)[6]

---

[5] A "ride along" is when a manager accompanies an MSC on her sales calls for one or two days. (Hatten Dep. 66:17-20.)

[6] April Coltharp, a former MSC who was older than Hatten, submitted an affidavit asserting that Hatten made similar comments to her.  Coltharp, like Harris, had the opportunity to talk extensively to Hatten during the ride alongs.  In one of their first ride alongs, Hatten told Coltharp that it was against his religion to be alone with a woman other than his wife.  Hatten told Coltharp that he did not want his wife to work and made it a point to introduce Coltharp

Harris also testified that, in the early part of 2007, another MSC told her that other MSCs were calling her a "High Dollar Whore" and "Debbie Downer." (*Id.* at 99.) Shortly afterwards, Harris confronted Hatten with this information. He responded that it had happened, and he was sorry. (*Id.* at 102:1-4.) According to Harris, Hatten took it "very seriously" and told her to "let [him] see if [he] could put a stop to it." (*Id.* at 6-9.) Harris asked if it had been going on for a long time, and he told her it had. When she asked why he had not put a stop to it, because he was the manager, he responded that he would try to take care of it. (*Id.* at 102:6-14.) The next day, Harris inquired of Hatten what he had done. He told her that he had called four individuals and that he thought he had taken care of it. (*Id.* at 102-103.) Harris argues that Hatten should have been disciplined for failing to report this incident to the Chief Compliance Officer at Auxilium. (*Id.* at 104:2-106:1.) No MSC was ever disciplined for calling Harris "Debbie Downer" or "High Dollar Whore." (Roberts Dep. 53:18-25, Jan. 21, 2009.) Harris believes that, at some point, she asked to be assigned to an RSD other than Hatten, but she cannot be sure. (Harris Dep. 106-109.)

Harris also felt that others were being promoted when she had more experience and a better performance record. (*Id.* at 109:19-22.) Harris felt that, based on the high rankings she received and the fact that she "did the job well" she should have been considered for a promotion. (*Id.* at 186:4-14.) Harris received favorable feedback from supervisors, including Hatten. (*Id.* at 186-187.) In order to receive a promotion, an MSC must be recommended by her RSD. (*Id.* at 110:1.) At one point, Harris had a conversation with Hatten and told him that she

---

to his wife because she "wanted to meet the girls her husband works with." (Doc. No. 84, Ex. R ¶¶ 1-7.) When Coltharp resigned from Defendant, she reported Hatten's derogatory comments to Sue Sharr in Defendant's Human Resources Department. (*Id.* at ¶ 11.) Parks testified to similar comments Hatten made. In particular, during one ride along, Hatten told Parks that, in his opinion, primarily black and Hispanic women should have abortions. (Doc. No. 84, Ex. U ¶ 12.)

felt she was qualified for a promotion and that she was interested in one. (*Id.* at 110-111.) Harris alleges that she expressed an interest in a promotion only to Hatten because "[she] could not go outside the chain of command." (*Id.* at 21-25.)

Harris complains that two male employees received promotions shortly after this conversation. (*Id.* at 111:15-25.) She further contends that Sarah Degen, a younger woman, was promoted to Marketing Development Manager when she had never received any kind of award or been part of the President's Club. Harris alleges that the position was never even posted so that others could apply. (*Id.* at 115:22-116:2.) Harris further avers that Degen was promoted because she was engaged in a romantic relationship with Ed Kessig, Defendant's Vice President of Sales. (*Id.* at 116-119.) According to Harris, Defendant hires younger MSCs because Testim is a "quality of life drug," one of the benefits of which is to make the patient feel younger and to have more vigor. (*Id.* at 176:7-14.)

For a short period of time, at the beginning of 2005, Harris served as Regional Sales Trainer ("RST"), but she did not receive extra pay for the position. (*Id.* at 68:21-7.) RSTs are responsible for training the new MSCs hired into a region. (*Id.* at 72:3-15.) Ed Kessig called Harris and asked her to attend a training session in Philadelphia for the position. (*Id.* at 69:1-16.) At the training, Harris was told that Defendant was considering giving the RSTs a bonus of $2000 when they completed the training. (*Id.* at 70:16-25.) Harris alleges that, when she returned from training and explained the function of the job to Hatten, he told her that he had a "different idea of what the trainer position would be." (*Id.* at 74:1-6.)

A May 2005 email exchange reveals that Harris informed Hatten that she had a large geographic territory and did not want to take time out of the field because she considered "selling Testim successfully [her] first priority and focus." (*Id.* at 213:17-21.) In the same email, Harris

told Hatten that she did not believe that a quiz Hatten wanted her to administer fell into the RST's responsibilities and that she would like to "stay focused on the field and selling." (*Id.* at 214.) She then informed Hatten that, if he thought the quiz was the RST's responsibility, then "maybe she was not the person for the job." (*Id.*) Hatten then replied to Harris by describing the RST position as he envisioned it and asking her if it was something she wanted to go forward with. (*Id.* at 220:17-20.) Harris responded that the job he was describing was different from that which she had been trained for in Philadelphia. She informed him that she could not afford to be the RST for their region. (*Id.* at 222-223.) Harris informed Hatten that she "had to make large bonuses for [her] job to work." (*Id.* at 224:13-14.) Hatten then made Greg Sanchez, who had recently transitioned from being a part-time to a full-time MSC, the RST. (*Id.* at 74:1-5.)

In early 2007, Defendant implemented an incentive compensation plan for MSCs based on whether the MSC could achieve a certain quota of Testim prescriptions within her territory. (Doc. No. 84, Ex. F ¶ 9.) In 2006, Testim had a national market share of 19 percent; however, when it implemented the quota system, Defendant assigned Harris an annual quota of 5,676 prescriptions for the North Houston territory, which accounted for 67 percent of the market share. (*Id.* at ¶ 10.) As a result, Harris asserts that her 2007 quota was unattainable. Hers was the highest quota in her region and the fourth highest in the country. (*Id.* at 82:13-20.) Harris contends that she was deprived of substantial incentive compensation that Defendant pays MSCs who achieve their quotas. (*Id.* at ¶ 12.) According to Plaintiffs, an MSC can get paid a bonus only if he or she obtains one hundred percent of his or her quota. (Harris Dep. 161:1-19.) If Harris did not obtain her quota, she would make less money and lose her rank at the top of the company. If she ranked near the bottom of the company, she would risk termination for being a "low performer." (*Id.* at 82:13-20.) Harris concludes that, if her quota would have been fair, she

would have qualified for the President's Club bonus again in 2007. (*Id.* at 267:24-25.) Harris believed that Hatten was hiring younger women for MSC positions and giving them lower quotas. Harris complained to Hatten about the quotas, and he tried to offer her some explanation. (*Id.* at 96.)

Harris took a leave of absence on June 12, 2007 and resigned from Defendant on October 12, 2007. (Harris Dep. 121; 289-90.) Harris alleges that her replacement, Gerald Brady, a younger man, receives a higher base salary than she did and has a lower sales quota. (*Id.* at 171:15-25; Kessig Dep. 198-199.) Parks took a leave of absence from her position on June 2, 2007 and returned to work on September 10, 2007. (Parks Dep. 240.) Parks took another leave of absence from October 8, 2007 to November 12, 2007 and was ultimately terminated on January 10, 2008 because she refused to perform her job duties. (*Id.* at 96, 99, 140-141, 240.)

In her Second Amended Complaint, Harris asserts, on behalf of herself, Parks, and others similarly situated, that Defendant violated the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), *et seq.* and § 215, the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* Harris also asserts claims arising from Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*

## II.    ANALYSIS

### A. Whether Parks is a Party and Plaintiffs' Rule 11 Motion

Defendant argues that Parks has joined this matter only as an opt-in plaintiff to Harris's FLSA and EPA claims. According to Defendant, Parks has not joined this suit with respect to the Title VII or ADEA claims. Citing Federal Rule of Civil Procedure 10(a), Defendant points out that Parks is not listed as a plaintiff on Harris's Second Amended Complaint. Parks

originally filed her own complaint alleging these claims, but on December 14, 2007, the Honorable Lynn Hughes dismissed Parks' complaint because she had failed to exhaust her administrative remedies. Parks received a right to sue letter from the EEOC on April 29, 2008, but, according to Defendant, she has never refiled her Title VII or ADEA claims in this or any other Court. (Doc. No. 84, Ex. Z.) Plaintiffs respond that, after Parks exhausted her administrative remedies, she joined the Second Amended Complaint, which was filed on June 30, 2008. (Doc. No. 33.) Plaintiffs also request that the Court sanction Defendant, pursuant to Federal Rule of Civil Procedure 11, for making false representations to the Court.

Federal Rule of Civil Procedure 10(a) states: "Every pleading must have a caption with the court's name, a title, a file number, and a Rule 7(a) designation. The title of the complaint must name all the parties; the title of other pleadings, after naming the first party on each side, may refer generally to other parties." This requirement extends to amended complaints, as the necessary consequence of the rule that an amended pleading completely supersedes the prior pleading such that the prior pleading no longer has legal effect. *Jones v. Parmley*, No. 5:98-cv-374, 2005 WL 928666, at *1 (N.D.N.Y. April 20, 2005) (citing *Thompson v. Kramer*, Civ. A. No. 93-2290, 1994 WL 702927, at * 11 (E.D.Pa. Dec. 13, 1994) and *Hamilton v. Covington,* 445 F.Supp. 195, 199 (W.D.Ark. 1978)); *see also Washington v. M. Hanna Const. Inc.*, 299 Fed.Appx. 399, 402 (5th Cir. 2008) (not designated for publication) (citing *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (holding that the allegations in the plaintiff's amended complaint supersede the original complaint and renders it of no legal effect unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading). "Therefore, a party that is not named in the caption of an amended complaint is not a party to the action." *Jones*, 2005 WL 928666 at * 1.

Harris filed her First Amended Compliant on March 7, 2008. Attached to the First Amended Complaint was Park's consent to join the suit with respect to all the claims. (Doc. No. 13, Ex. 1.) As Defendant points out, however, Parks had not at that point exhausted her administrative remedies with respect to the Title VII and ADEA claims. A court may entertain a Title VII or ADEA claim only if the aggrieved party has exhausted his or her administrative remedies. *Taylor v. Books A Million, Inc.,* 296 F.3d 376, 378-79 (5th Cir.2002); *Fobbs v. Potter,* No. 08-10989, 2009 WL 1706012, at *1 (5th Cir. June 17, 2009) (not designated for publication) (citing *Pacheco v. Mineta,* 448 F.3d 783, 788 (5th Cir. 2006). The First Amended Complaint acknowledged this, stating that "Ms. Parks consents to participate as a plaintiff with respect to the EPA and FLSA claims. Upon requesting and obtaining a Right to Sue letter from the EEOC, Ms. Parks will have exhausted her administrative remedies with respect to her claim against Auxilium under Title VII and the ADEA." (Doc. No. 13 ¶ 37.)

Plaintiff's Second Amended Complaint was accompanied by a Motion for Leave to Amend, filed on June 30, 2008. The Motion began by stating that "Plaintiff, Jan Harris, individually and on behalf of others similarly situated, files this Motion for Leave to File Second Amended Complaint and respectfully asserts as follows." The Motion then stated that the "Plaintiffs sought to amend the Complaint to clarify their factual allegations in light of Auxilium's newly discovered evidence." The Motion made no mention of the fact that Parks had exhausted her administrative remedies and now sought to join Harris's Title VII and ADEA claims. The Second Amended Complaint did list Parks as a party. (Doc. No. 33 ¶ 3.) It stated that "Pursuant to the Equal Pay Act and the FLSA, Kathy Parks hereby consents to participate as a party plaintiff in this action. Ms. Parks has satisfied all other conditions precedent to this

action, including exhausting her administrative remedies with respect to her claims against Auxilium under Title VII and the ADEA." (Doc. No. 33 ¶ 37.)

The Court agrees with Defendant that, at this time, the only claims Parks has asserted are those brought pursuant to the EPA and the FLSA. While the Court realizes that this result seems overly technical, it observes that Parks failed, on three occasions, to notify Defendant, and this Court, of her intent to assert Title VII and ADEA claims.[7] First, the Second Amended Complaint, which superseded the First Amended Complaint, did not contain Parks' consent to join the suit with respect to the Title VII and the ADEA claims. It only stated that Parks consented to join the action "[p]ursuant to the Equal Pay Act and the FLSA." Second, Plaintiffs' Motion for Leave to Amend did not seek to assert new Title VII and ADEA claims on Parks' behalf. Third, as Defendant points out, Parks' name should have been listed in the caption of the Second Amended Complaint. While the caption included the term "similarly situated individuals," which describes Parks as a plaintiff in the EPA and the FLSA collective actions, it did not list her as an individual plaintiff. At least one court of appeals has found that, in the context of the Federal Rules of Appellate Procedure, the phrase "similarly situated individuals," like the phrase "et al," is "ineffective to bring the [plaintiff] before [the] court." *OTR Drivers at Topeka Frito-Lay, Inc.'s Distribution Center v. Frito-Lay, Inc.*, 988 F.2d 1059, 1061 (10th Cir. 1993). As a result, the Court will only consider Parks' EPA and FLSA claims.

---

[7] The Court notes the Eleventh Circuit's decision in *Marsh v. Butler,* 268 F.3d 1014, 1024 n. 4 (11th Cir. 2001), in which it held that "To use the Rule 10 caption to create an ambiguity when the statement of the claim is itself not ambiguous is incorrect." In that case, the caption of the plaintiff's compliant stated that the plaintiff intended to sue a sheriff in her individual capacity, but the plaintiff's complaint did not state a claim against the sheriff in her individual capacity, as required by Rule 8. Nevertheless, the Eleventh Circuit still considered the plaintiff's arguments against the sheriff in her individual capacity because the parties and the district court had assumed the plaintiff stated a claim against the sheriff both in her official and individual capacity. The Eleventh Circuit noted that when, as in this case, the plaintiff's statement of her claim is somewhat ambiguous, the caption is one tool the court can use to resolve the ambiguity.

Plaintiffs have moved to sanction Defendant's counsel for violating Rule 11 by making false representations to the Court regarding Parks' status as a party. Specifically, Plaintiffs objects to the following statement from Defendant's Motion for Summary Judgment:

> Ms. Parks received her right to sue on April 29, 2008 but never refiled her Title VII or ADEA claims with this or any other court. Thus, Ms. Parks never took the action necessary to file her Title VII or ADEA claims and the time for doing so has long since passed.

(Doc. No. 76 at 7.) Plaintiffs further object to this statement from Defendant's Reply:

> Ms. Parks received her right to sue on April 29, 2008, but never refiled her Title VII or ADEA claims with this or any other court.

(Doc. No. 86 at 5.) Plaintiffs argue that these statements are "clearly and knowingly false" and that the Court should impose appropriate sanctions on Defendant. Defendant responds that it has not made misrepresentations to this Court and that Plaintiffs did not follow the correct procedure for filing a Rule 11 motion. As outlined above, the Court ultimately agrees with Defendant that Parks has not *properly* refiled her Title VII or ADEA claims, since her claims had not been exhausted at the time Plaintiffs filed their First Amended Complaint. Also, Defendant is correct that Plaintiffs failed to follow the proper procedure for a Rule 11 motion. Rule 11(c)(2) requires that the party seeking sanctions serve the motion on the offending party, but refrain from filing the motion with the Court unless the offending party against whom sanctions are sought does not correct or withdraw the offending matter within twenty-one days after service. The Fifth Circuit has held that "[c]ompliance with the service requirement is a mandatory prerequisite to an award of sanctions under Rule 11," and sister courts have denied motions for sanctions because the moving party failed to comply with "the strict notice requirements of Rule 11" by filing the motion with the court before serving it. *Tompkins v. Cyr*, 202 F.3d 770, 788 (5th Cir. 2000); *see also Bertaut v. Parish of Jefferson*, No. 02-2104, 2003 WL 21349664, at * 1-2 (E.D.La. June 3,

16

2003) *and Riley v. City of Jackson*, 2 F.Supp.2d 864, 880 (S.D.Miss. 1997). Plaintiffs have not represented to the Court that they properly served a motion for sanctions on Defendant prior to filing their Sur-Reply with the Court. The Court will not, therefore, grant Plaintiffs' Motion for Sanctions.

### B. Defendant's Motion to Strike Plaintiffs' Summary Judgment Evidence and for Sanctions

The Court now turns to Defendant's Motion to Strike Plaintiffs' Summary Judgment Evidence, specifically the affidavit of Caleb Price dated September 20, 2008 ("the Second Price Affidavit"). Price was employed by Defendant as an MSC from 2004 to 2007. (Doc. No. 91, Ex. B.) On May 6, 2009, Plaintiffs submitted the Second Price Affidavit with their Response to Defendant's Motion for Summary Judgment.

Plaintiffs had previously identified Price as a potential witness in their initial disclosures, filed pursuant to Federal Rule of Civil Procedure 26, which were served on Defendant on January 4, 2008. (Doc. No. 85, Ex. A ¶ I (3).) Defendant served its first Request for Production on May 27, 2008, in which it requested all documents that refer or relate to Plaintiffs' claims in this matter, including "[a]ll documents that refer or relate to any communication, conversation or correspondence that [plaintiffs] had with any individual, whether or not that individual is or was at any time employed by Auxilium, with respect to the allegations that form the basis of all claims contained in [Plaintiffs'] Complaint" and "[a]ll documents on which [Plaintiffs] intend[s] to rely in presenting [their] allegations or claims in this litigation." (Doc. No. 85, Ex. B ¶¶ 33, 40.) Plaintiffs did not produce the Second Price Affidavit.

On February 2, 2009, at Harris's deposition, Defendant asked what facts Price had that support Harris's claims. Harris responded by asking "Did he not submit an affidavit? I thought he submitted an affidavit." (Harris Dep. 123:1-25.) Harris did not produce the Second Price

Affidavit during or after her deposition, and Defendant did not request the Second Price Affidavit because Price had submitted an earlier affidavit dated August 3, 2007 ("the First Price Affidavit").

Defendant first attempted to notice Price's deposition in February 2009. (Doc. No. 91, Ex. I.) Defendant attempted, on several occasions in March 2009, to serve Price with a deposition subpoena at his home address and to contact Price by telephone. (Gold Aff. ¶ 9-13.)[8] Defendant contacted Plaintiffs' counsel, who claimed that neither he nor his clients had control over Price and had no obligation to assist in arranging the deposition. (Gold Aff. ¶ 15.) According to Defendant, Plaintiffs' counsel failed to provide possible dates for Price's deposition. (Gold Aff. ¶ 16.) Plaintiffs' counsel contends that he "fully cooperated" with Defendant's attempts to schedule Price's deposition—the record reflects that he informed Defendant that he was available on Defendant's proposed date for Price's deposition, March 17, 2009. (Doc. No. 91, Ex. J.) Defendant continued to attempt to schedule Price's deposition in May 2009, after the close of the discovery deadline. (Doc. No. 91, Ex. K.) Defendant informed Plaintiffs' counsel at this time that it believed Price was attempting to evade service of the deposition subpoena. (*Id.*) Plaintiffs represent that Defendant never forwarded Plaintiffs' counsel a deposition notice for Price in May 2009. After receiving Plaintiffs' Response to its Motion for Summary Judgment, Defendant asked Plaintiff's counsel when he received the Second Price Affidavit, but he refused to disclose this information, citing the attorney-client and work product privileges. (Gold Aff. ¶ 17.)

---

[8] Specifically, Defendant sent a process server to Price's home address on several occasions. The process server confirmed with a neighbor that the home belonged to Price and that the vehicle in the drive way was driven by Price, but no one answered when the process server knocked on the door. Furthermore, when the process server attempted to call Price, a man answered the telephone but claimed that he was not Price. (Gold Aff. ¶¶ 9-13.) Defendant also called Price's former counsel on March 10, 2009 and inquired whether he would be representing Price at his deposition in this matter. (Gold Supp. Aff. ¶ 5, Ex. A.) Defendant did not, however, send a deposition notice or subpoena to Price's former counsel. (Wood Aff.)

Plaintiffs' counsel argues that he submitted the First Price Affidavit, attesting to Defendant's discriminatory conduct, on August 8, 2007. (Doc. No. 91, Ex. B.)  Price then filed suit against Defendant in the 298th District Court of Dallas County Texas on November 5, 2007; Defendant removed the case to the United States District Court for the Northern District of Texas (Doc. No. 91, Ex. D-E.)  That case ultimately resulted in settlement. (Doc. No. 91, Ex. F.)

Defendant rejoins that Price's deposition should be stricken on a number of grounds, primarily because Plaintiffs did not supplement their discovery responses with the Second Price Affidavit.  Defendant further requests that the court impose sanctions pursuant to Federal Rule of Civil Procedure 37 for this failure.   Plaintiffs contend that the Second Price Affidavit is substantially similar to the First Price Affidavit, that Defendant has failed to depose Price in either the litigation in the Northern District of Texas or this case, and that Defendant will not be harmed by Plaintiffs' inclusion of the Second Price Affidavit in their Response.

The Court agrees with Plaintiffs that the First Price Affidavit is substantially similar to the Second Price Affidavit, and that it is not Plaintiffs' responsibility to compel third party witnesses to appear at depositions.  Nevertheless, it is true that Plaintiffs failed to supplement their discovery responses with the Second Price Affidavit and that Defendant made good faith attempts to serve Price with a deposition subpoena in this lawsuit.  Because Price evaded service of the deposition subpoena, depriving Defendant of the opportunity to counter the allegations he makes in the both the First and Second Price Affidavits, the Court will grant Defendant's Motion to Strike the Second Price Affidavit and will not consider it on summary judgment.  As Defendant has failed to show, however, that it was harmed by Plaintiffs' failure to supplement their discovery responses with the Second Price Affidavit, which was substantially similar to the

First Price Affidavit, or that Plaintiffs had any role in Price's evasion of service, the Court will not impose sanctions pursuant to Rule 37.

### C. Summary Judgment Standard

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. F.R.C.P. 56(e)(1); *See, e.g.*, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### D. Compensation Claims

Plaintiffs claim that Defendant failed to pay them compensation equal to that of male MSCs and to female MSCs under the age of 40. Harris advances this claim under both Title VII and the EPA; Parks has joined Harris's EPA claims.

### 1. The Equal Protection Act

The EPA requires that men and women who perform equal work receive equal pay, unless a difference in pay is justified by reasons other than their gender. *Chance v. Rice Univ.*, 984 F.2d 151, 153 (5th Cir. 1993). The statute reads, in pertinent part:

> No employer having employees subject to any provision of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions....

29 U.S.C. § 206(d) (1). To establish a *prima facie* case, the plaintiff must offer proof (1) that the defendant is subject to the EPA; (2) that she performed work in a position requiring equal skill, effort, and responsibility under similar working conditions; and (3) that she was paid less than a male employee in that position. *Reznick v. Associated Orthopedics & Sports Medicine, P.A.*, 104 Fed.Appx. 387, 390 (5th Cir. 2004) (citing *Peters v. City of Shreveport*, 818 F.2d 1148, 1153 (1987) *abrogated on other grounds by Price Waterhouse v. Hopkins,* 490 U.S. 228, (1989)).

Once the plaintiff establishes a prima facie case, the burdens of production and persuasion shift to the employer to demonstrate that the disparate wage payments were made pursuant to: 1) a seniority system; 2) a merit system; 3) a system which measures earnings by quantity or quality of production; or 4) a differential based upon any factors other than sex. 29 U.S.C. § 206(d)(1). In an EPA case, the defendant has the burden of persuasion if the plaintiff establishes a prima facie case. *Vogt V. Nationwide Mutual Insurance Company*, No. Civ. A.H-03-1526, 2005 WL 1830565, at *3 (S.D.Tex. Aug. 1, 2005) (citing *Plemer v. Parsons-Gilbane*, 713 F.2d 1127, 1136 (5th Cir. 1983)). "Because the employer bears the burden of proof at trial, in order to prevail at the summary judgment stage, the employer must prove at least one

affirmative defense 'so clearly that no rational jury could find to the contrary.'" *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3rd Cir. 2000).

Under the EPA, "'wages' generally include all payments to ... an employee as remuneration for employment.  The term includes all forms of compensation irrespective of the time of payment ... whether called ... a bonus." *Kern v. GE Capital Information Technology Solutions*, No. Civ. A. 3:01-cv-2109-P, 2003 WL 22433817, at *5 (N.D. Tex. Feb. 19, 2003) (citing 20 C.F.R. § 1620.10 (2003)).[9] It is well established that, based on the C.F.R. definition of "wage," bonus payments and incentive compensation should be used to calculate wages for the purposes of an EPA claim. *Brown v. Clarke Power Services, Inc.*, No. 1:07-cv-1039, 2009 WL 1394839, at *10 (S.D.Ohio May 18, 2009) (collecting cases).

### a)   Timeliness of Plaintiffs' EPA Claims

Claims under the FLSA, which includes EPA claims, must be filed within two years after the cause of action accrues, or within three years if the alleged violation was "willful." *Ikossi-Anastasiou v. Board of Supervisors of Louisiana State University*, --- F.3d ---, 2009 WL 2501233, at *5 (5th Cir. Aug. 18, 2009) (citing 29 U.S.C. §§ 206(d), 201, *et seq.*, 255(a)).  An employer willfully violates the FLSA if it "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."  Because willfulness is a question of fact, summary judgment in favor of the employer is inappropriate if the plaintiff has introduced evidence sufficient to support a finding of willfulness.  Where the plaintiffs have filed a collective action under 29 U.S.C. § 216(b), the action does not commence with respect to each individual plaintiff until he or she has filed with the court a consent to join the suit. *Coleman v.*

---

[9] In their Response, Plaintiffs do not respond to Defendant's argument that the Court should consider the gross annual pay of the MSCs.

*Circus Casinos, Inc.*, 2:04-CV-00747-PMP, 2006 WL 2591044, at *14 (D. Nev. Sept. 8, 2006) (citing 29 U.S.C. § 256).

Defendant argues that, because the Second Amended Complaint did not allege a willful violation with respect to Plaintiffs' EPA claims, the two year statute of limitations applies to these claims.  As a result, Defendant argues that, since Harris filed this action on October 22, 2007, any EPA claim that proceeds October 22, 2005 is time-barred.  Because Parks consented to join the action on March 10, 2008, Defendant contends that any EPA claim proceeding March 10, 2006 is time-barred.  In response, Plaintiffs contend that the Court considered, and rejected, Defendant's argument in its Memorandum and Order on Defendant's First Motion for Summary Judgment ("First Order").  The only issue the Court considered in the First Order, however, was whether Plaintiffs' sales region was the relevant "establishment" for their EPA claims.  (Doc. No. 58.)  Plaintiffs also contend that the Second Amended Complaint states that "At all relevant times, Auxilium acted in bad-faith, intentionally, willfully, and/or with malice in discriminating and retaliating against Jan Harris, as alleged herein."  (Pls.' 2d Amd. Compl. ¶ 26.)  While this language clearly does not refer to Parks' EPA claim, Plaintiffs do argue in their Response to Defendant's Motion for Summary Judgment that Defendant recklessly disregarded its obligations under the EPA.  (*See* Pls. Resp. at 25 ("The hiring, promotion, and pay disparities to which Auxilium subjected Mmes. Harris and Parks and other older female employees are no accident but directly attributable to the company's failure to formulate or implement even rudimentary EEO policies  and procedures ....  Auxilium had no written criteria for determining its MSCs' starting base pay."))  Because Plaintiffs have raised fact issues as to whether Defendant's failure to pay them equal compensation to male MSCs was willful, the Court will apply the three year

statute of limitations.[10]   Any of Harris's claims accruing before October 22, 2004 will be time-barred and any of Parks' claims accruing before March 10, 2005 will be time-barred.

### b)  Plaintiffs' EPA Claims

Defendant argues that the male comparators identified by Plaintiffs actually earned less total compensation than they did.   Specifically, Peterson, O'Keefe, Dawson and Wisniewski, male MSCs that Plaintiffs identify in their Second Amended Complaint, never earned more than either Plaintiff.   Defendant further argues that Harris has intentionally omitted the earnings of other male MSCs in her own region that earned less compensation than she did, including Caleb Price, Frank Jerome Vascellaro, Joseph Jai Reed, and Thomas Drew Connell.   Defendant also asserts that several of the male comparators identified in Plaintiffs' Second Amended Complaint did not hold the position of MSC for the relevant years, but Defendant does not provide the names of these comparators or evidence of the position they actually held.

Plaintiffs respond by arguing that the law of the case doctrine prevents summary judgment on Defendant's EPA claims.   Plaintiffs contend that, in its First Motion for Summary Judgment, Defendant advanced the same arguments in support of its EPA claim, which the Court rejected.   Further, Plaintiffs argue that their burden is merely to demonstrate that they were paid less than any one male employee in a similar position.   In their Response, Plaintiffs have identified a number of male comparators who allegedly earned more gross income in 2006 and 2007 and higher base wages in 2004, 2005, 2006, and 2007.

### i.    Law of the Case Doctrine

---

[10] The Court's application of the three year statute of limitations is not in conflict with the cases cited by Defendant in its briefing.   *See Coleman*, 2006 WL 2591044 at *14 (citing *Bonilla v. Las Vegas Cigar Co.*, 61 F. Supp. 2d 1129, 1132-33 (D. Nev. 1999) and *Perella v. Colonial Transit, Inc.*, 148 F.R.D. 147, 149 n.2 (W.D. Pa. 1991)).   The instant case is distinguishable from *Coleman, Bonilla*, and *Perella*.   The plaintiff in *Coleman* pled that the defendant had acted willfully but essentially waived this argument by failing to respond, in numerous rounds of briefing, to the defendant's argument that the two year statute of limitation should apply.   In *Bonilla* and *Perella*, the plaintiffs not only failed to plead in their complaints that the defendants acted willfully, but they also failed to ever advance the argument in status conferences or briefing.

The law of the case doctrine directs courts to refrain from revisiting issues that were resolved earlier in the litigation. In civil cases, a district court is not precluded by the law-of-the-case doctrine from reconsidering previous rulings on interlocutory orders such as summary judgment motions, as those rulings are not final and lack res judicata effect. *United States v. Palmer*, 122 F.3d 215, 220 (5th Cir. 1997) (citing *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990), *overruled on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 n.14 (5th Cir. 1994)). The Court rejected Defendant's First Motion for Summary Judgment on Plaintiffs' EPA claims because there were fact issues regarding the relevant "establishment" for selecting comparators. (Doc. No. 58.) For the purposes of the instant Motion for Summary Judgment, Defendant concedes that Plaintiffs can be compared with all MSCs, not merely those in their region. Given this concession, the Court will revisit its prior ruling.

### ii.   Plaintiffs' Pay Relative to Comparators

The parties are essentially divided over whether Plaintiffs must demonstrate that they were paid less than every male MSC, or whether it is sufficient to show that they were paid less than some of the male MSCs. In support of their position that they must show only that they were paid less than one male comparator, Plaintiffs cite *Peters v. City of Shreveport*, 818 F.2d at 1148, and *Lenihan v. Boeing Co.*, 994 F.Supp. at 776. In *Lenihan*, the district court noted that "the plaintiff need not prove that she was paid less than every comparable male employer. It is enough for the plaintiff to show that there is discrimination in pay with respect to one employee of the opposite sex." 994 F.Supp. at 799 (internal citation omitted) (citing *EEOC v. White & Son Enter.*, 881 F.2d 1006, 1009 (11th Cir. 1998)).

Defendant, on the other hand, directs the Court's attention to *Ambrose v. Summit Polymers, Inc.*, in which the Sixth Circuit stated that "[t]here is some case law suggesting that a plaintiff many not ignore lower-earning employees of the opposite sex when seeking to show inequality in pay—i.e., a plaintiff cannot establish a prima facie case by showing only that the highest earning employees of the opposite sex were paid more." 172 Fed. Appx. 103, 106 (6th Cir. 2006) (citations omitted).   The Sixth Circuit noted, however, that these cases used a methodology whereby the plaintiff's pay was compared to the average pay of the opposite-sex employees doing equal work.   While Defendant has argued that Plaintiff was paid more than all other male MSCs in her region, it has not presented evidence comparing her wages to the average wage of all male MSCs, which Defendant has conceded, for the purposes of this Motion, is the relevant establishment.   Defendant has only failed to offer evidence comparing Plaintiffs' pay with the average salary of similarly situated male MSCs.   Defendant then cites *Strag v. Board of Trs.*, which held "[i]solated incidents of random comparisons demonstrating disparities in treatment may be insufficient to draw a prima facie inference of discrimination without additional evidence that the alleged phenomenon of inequality also exists with respect to the entire relevant group of employees."   55 F.3d 943, 950 (4th Cir. 1995).   *Strag*, however, is distinguishable; in that case, the plaintiff had only identified one male comparator, a male professor who taught in a different academic department than that of the plaintiff and who had more teaching responsibilities than the plaintiff.[11]

Plaintiffs' Second Amended Complaint alleged that several MSCs received either a higher base salary or gross wages than Harris, including: Arthur Baldwin, Jim Hinchberger, Chris Noonan, Greg Sanchez, Daniel Diaz, Mesa Whitehurst, Kirk Nicholas, Richard Cain,

---

[11] Defendant also cites *Vasquez v. El Paso County Community College Dist.*, 177 Fed. Appx. 422 (5th Cir. 2006), which is distinguishable from the instant case because there were no similar employees of the opposite sex who were paid more than the plaintiff.

Duane Moore, Nelson Morgan, Peter Debbas, Timothy O'Keefe, Joseph Dawson, Rick Clark, Nick Costa, Andres Gomez, Roman Wisniewski, Peter Wilkins, Dan Peterson, Craig Patzer, Steve Pagnotta, Jeff Seger, and Jeff Rosenstack. (Pls. 2d Amd. Compl. ¶ 14.)  Plaintiffs also identify a number of female MSCs under the age of forty, or younger than Harris, who allegedly earned a higher base salary or gross wages than Harris.  These comparators include Kristin Olschefkski, Jennifer Singler, Jessica Kenady, Allison Fielder, Kimberly Gallegos, Sarah Eckert, Susan Blom, Christina Myers, Carolyn Jackson, Alethia Colclasure, Jessica Pompa, Marina Elder, Heather Irwin, Robin Stone, Danielle Young, Robin Burger, Paula Sharp, Sarah Deegan, Bridgette Cravens, Paula Nicholas, and Susan Wasserman. (Pls. 2d Amd. Compl. ¶ 15.)

Defendant contends that, in 2004, Harris and Parks received more gross compensation than "all but two of the twenty-three male MSCs [Plaintiffs] identified"; in 2005, Harris's gross wages were "greater than all but four" and Parks' was "greater than all but eight"; in 2006, Plaintiffs' gross compensation was "higher than all but ten"; and in 2007, Harris's gross compensation was "higher than all but six" and Parks' was "higher than all but eight." (Doc. No. 99 ¶ 63.)

Defendant's arguments are ultimately not persuasive.  In their Response, Harris has identified fifteen males who earned more gross compensation than she did in 2006, and Parks has identified fourteen. (Pls.' Amd. Resp., Doc. No. 100 at 25.)[12]  Of these male employees, eleven are classified as "MSCs."  Records for two of the men, Kirk Nicholas and Jeff Seger, classify them as working in "sales" and records for another two men, Peter Wilkins and Gregory

---

[12] The Court notes that Plaintiffs have not produced evidence, and did not argue in their Response to the Motion for Summary Judgment, that the younger female MSCs identified in their Second Amended Complaint earned more than Plaintiffs within the relevant time period. The Court therefore considers Plaintiffs' ADEA compensation claim to be waived. Furthermore, while Plaintiffs' Response identified male MSCs with higher base salaries for the years 2004 and 2005, it did not present evidence comparing Plaintiffs' gross salaries to that of male comparators for these years.

Sanchez, have been redacted so that no information is available about their position. (*Id.; see also* Doc. No. 101 at Bates 8412, 8399, 8415, and 0552.)  Harris has further identified eight men who earned more gross compensation than she in 2007.  Of the men listed, five are classified as MSCs.  Payroll records for one man, Daniel Diaz, indicates that he was an "MSS" and records for two men, Peter Wilkins and Richard Clark, have been redacted so that no information is available about their positions.  (*Id.* at Bates 8473, 8574, and 5580.)  As a result, Plaintiffs have sufficiently demonstrated, for the purposes of a prima facie case, that there were male MSCs who earned more gross compensation than they did in 2006 and 2007.  Defendant has not argued that these men had responsibilities that varied from those of Plaintiffs.  The Court therefore finds that Plaintiffs have created a prima facie case under the EPA.

Since Plaintiffs have demonstrated a prima facie case, Defendant must now show that the disparate pay resulted from (i) a merit system; (2) a seniority system; (3) a system which measures earnings by quantity or quality; (4) a differential based on any other factor other than sex.  *Id.* (citing 29 U.S.C. § 206(d)(1)).    Defendant claims that the variations in pay between Plaintiffs and other MSCs are based on the fourth prong, "any factor other than sex." "Any factor other than sex" is a general, catch-all exception to the application of the EPA.  *Perales v. Am. Ret. Corp.*, 96 B.N.A. 1302, 2005 WL 2367772, at 21 (W.D.Tex. 2005) (citing *Irby v. Bittick*, 44 F.3d 949, 956 n.10 (11th Cir. 1995)).  The exception has been found to apply "when the disparity results from unique characteristics of the same job; from an individual's experience, training or ability; or from special exigent circumstances connected with the business." *Id.* (citing *Glenn v. General Motors Corp.*, 841 F.2d 1567, 1571 (11th Cir. 1988), *cert. denied*, 488 U.S. 948 (1988)).

Defendant contends that there are several components to an MSC's gross wages, including base salary, incentive compensation, and contest award money, and that an MSC's

base salary is based on factors such as prior experience, tenure, performance, and the geographical location in which the employee works. (Roberts Aff. ¶¶ 3(a)-(b).) According to Susan Roberts, Defendant's Vice President of Human Resources, Defendant periodically reviews MSC salaries to ensure that they are equitable, based on those factors. (*Id.* at ¶ 1.) The RSD, along with the Area Sales Director ("ASD"), Kessig, and Roberts, plays a role in setting base salaries, and the RSD suggests equity increases and then gets the approval of Roberts, Kessig, and the ASD. (*Id.* at 172:3-15.) Roberts further testified that an MSC's incentive compensation is governed by the terms of the incentive compensation plan for that particular year, which is based on sales achieved by the MSC. (*Id.* at ¶ 3(d).) Contest award money is governed by the rules for a particular contest. (*Id.* at ¶ 3(e).) Defendant also asserts that, based on this system, there were females who were paid more than both Plaintiffs and other males.

The Court does not find Defendant's justifications altogether convincing. While Roberts did testify, via affidavit, that Defendant reviews MSC salaries to ensure that they are equitable, in her deposition she admitted that a comprehensive review of the MSC salaries did not begin until 2008. (Roberts Dep. 119, January 21, 2009.) Both Kessig and Roberts admitted that the company did not have specific, written criteria in place for either equity increases or merit increases to an MSC's salary. (Kessig Dep. 172:22-173:22; Roberts Dep. 118:15-119:6.) While the Fifth Circuit has observed, in an unpublished opinion, that a defendant's criteria does not have to be in writing, *see Wiley v. American Electric Power Service Corp.*, 287 Fed.Appx. 335, 342 (5th Cir. 2008) (not designated for publication), Defendant made no effort to apply its unwritten criteria to the male comparators that Plaintiffs identified in their Response. The hiring dates of these male employees range from December 9, 2002 (Jim Hinchberger) to June 30, 2005 (Peter Debbas), meaning that while some have more seniority and experience selling Testim than

Plaintiffs, some do not. Most of the men identified were hired at the same time or after Plaintiffs, meaning they have an equivalent amount of tenure. In some cases, however, men who were hired after Plaintiffs have base pay that is more than $200 higher per pay period (Daniel Diaz in 2006 and Mesa Whitehurst in 2007).[13] (Doc. No. 101, Ex. A3-A4 at Bates 8349 and 8574.) Most of the male comparators earned more than Plaintiffs in incentive compensation in 2006; however, at least one male comparator, Craig Patzer, who earned only slightly more incentive compensation than Parks and slightly less than Harris, and who was hired after both Plaintiffs, still earned a higher gross salary than both Plaintiffs. (Doc. No. 101, Ex. A3 at Bates 8404.)

Furthermore, Plaintiffs have created a fact issue regarding the disparities between their pay and that of their male comparators for 2007 based on Defendant's implementation of a quota system that was tied to the amount of incentive compensation MSCs could earn. Defendant argues that it did not start using the quota system until 2007, and that Plaintiffs almost met their quotas in 2007 despite the fact that both were on extended leave during the year. Finally, Defendant contends that Michael Waskom, a male employee under the age of forty, had a quota that required him to sell 2500 more boxes of Testim than Jan Harris. Defendant asserts that the differences in the quotas did not result in a difference in pay.

Roberts confirmed in her deposition that she had no role in setting quotas. (Roberts Dep. 116:1-8.) Further, she did not know if Defendant had any controls in place to ensure that the quota program was fair and non-discriminatory. (*Id.* at 51:11-17.) Instead, Hatten set the quotas for the MSCs in his region. (Parks Dep. 181:5-15.) Defendant did not identify which method, if

---

[13] The Court notes that it did not consider base pay for the purposes of Plaintiffs' prima facie case—it mentions it here to point out that, without more explanation from Defendant, it is difficult to reconcile the pay differentials between Plaintiffs and some of the male comparators.

any, Hatten used to determine the quotas.[14]   Harris testified that an MSC's bonus was directly correlated to his or her quota, and that women over 40 had the higher quotas, no matter which territory they were in.   Indeed, based on the compensation data provided by the parties, Harris had the highest quota in her region. (Doc. No. 77, Ex. B-8 at Bates 15474.)[15]   Parks has a quota that is higher than two of the three male MSCs listed in the document.   (*Id.* at 15473-15474.) While Defendant does identity one male MSC, Waskom, who had a higher quota than Harris, his territory is listed as "Beverley Hills" and Defendant has not asserted that he was also supervised by Jeffrey Hatten. (Doc. No. 77, Ex. B-8 at Bates 15391.)   Harris's replacement, a male, has a lower quota and a higher base salary than Harris.   (*Id.* at 171:19-23.)   Given that Defendant has the burden of persuasion, and viewing all of the facts in the lights most favorable to Plaintiffs, the Court finds that Harris and Parks have created material fact issues as to whether Defendant violated the EPA by failing to pay them comparable salaries to male MSCs.

### 2.   Harris's Title VII Compensation Claim

Title VII wage discrimination claims generally parallel that of an EPA violation. *Vogt*, 2005 WL 1830565, at *3 (citing *Siler-Khodr v. Univ. of Texas Health Sciences*, 261 F.3d 542, 546 (5th Cir. 2001)).   Unlike an EPA claim, however, to prevail under Title VII, a plaintiff must prove discriminatory intent.   *Id.* (citing *Lenihan v. Boeing Corp.*, 994 F.Supp. 776, 797 (S.D.Tex. 1998)).

For Title VII compensation claims, the fourth prong of the *prima facie* case requires the plaintiff to demonstrate that similarly situated males were treated differently under nearly

---

[14] In her affidavit, Roberts testified that the quotas were based on territory, market share, and volume, but the record indicates that Hatten, not Roberts, set the quotas.

[15] The Court notes that the quota information included in Exhibit B-8 could be incomplete.   The Court made its determination that Harris had the highest quota in the region by comparing her region number, 204, with that of other MSCs listed in the document.   Nonetheless, this evidence is sufficient to create a fact issue for the purposes of summary judgment.

identical circumstances. *Minor v. Alcatel USA Resources, Inc.*, No. 4:05-cv-339, 2007 WL

1342536, at * 4 (E.D.Tex. May 1, 2007) (citing *Ward v. Bechtel Corp.*, 102 F.3d 199, 200 (5th

Cir.1997)). If the defendant is able to state a legitimate, non-discriminatory reason for the

employment action, the plaintiff is left to prove that the defendant acted with discriminatory

intent. *Hofmeister v. State Dep't of Health*, 53 F.Supp.2d 884, 889 n.11 (S.D.Miss.1999) (citing

*Plemer*, 713 F.2d at 1131-32). At this point, the Title VII defendant does not have the burden of

persuasion; it "need not persuade the court that it was actually motivated by the proffered

reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it

discriminated against the plaintiff." *Plemer*, 713 F.2d at 1136. If the defendant carries this

burden, the plaintiff then bears the "ultimate burden of persuading the court that she has been the

victim of intentional discrimination. She may succeed in this either directly by persuading the

court that a discriminatory reason more likely motivated the employer or indirectly by showing

that the employer's proffered explanation is unworthy of credence." *Id.* (citation omitted). In a

Title VII case, the burden of persuasion always remains with the plaintiff. *Id.* This burden is

lighter than that the defendant must discharge in the EPA context, where the defendant has both

the burden of proof and the burden of persuasion.

In this case, Harris has established a prima facie case that she was not paid equal

compensation to similarly situated male employees.[16] Defendant has created a fact issue

regarding its motivations for paying Harris less than its male employees—namely, it asserts that

MSC salaries have a number of different components, including base salary, incentive

---

[16] In its briefing on Harris's Title VII claim, Defendant renews its argument that Harris was paid more than some other male MSCs. Defendant cites *Hein v. Oregon College of Education*, a Ninth Circuit case in which the district court, in deciding the plaintiff 's EPA claim, excluded one of the proffered comparators because he earned less than the plaintiff. 718 F.2d 910 (9th Cir. 1983). That is not the issue before the Court. While Defendant has demonstrated that Harris did earn more than some of her male counterparts, Plaintiffs have also shown that there were some male MSCs who earned more than they did.

compensation, and bonuses. The base salaries are determined by the MSC's experience, tenure, and geographic location. Hatten testified that variations in the quotas were based on an MSC's experience level. Assuming for a moment that these assertions are sufficient to discharge Defendant's burden under Title VII, Harris does not mention her compensation claim in her Response or argue that Defendant's proffered explanation is pretext. The Court will therefore grant summary judgment as to Harris's Title VII compensation claim.[17]

### E. FLSA Claims

#### 1. Administrative worker exemption

Defendant first contends that it is not obligated to pay MSCs overtime because they fall under the administrative work exemption of the FLSA. The FLSA provides that "no employer shall employ any of his employees for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). An employer claiming an exemption bears the burden of proving that the exemption is valid. *Heidtman v. County of El Paso*, 171 F.3d 1038, 1042 (5th Cir. 1999). In light of the FLSA's broad remedial aims, the exemptions from the FLSA's coverage must be narrowly construed against the employers seeking to assert them. *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960). The employer must prove that the employee falls "plainly and unmistakably within the terms and spirit" of the exemption. *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945). The inquiry into an employee's exempt status is "intensely factbound and case specific." *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1226 (5th Cir.1990).

---

[17] The Court has found that Parks has not properly filed her Title VII or ADEA claims in this Court. Even if her claims were properly before the Court, she has also failed to offer any evidence of pretext.

Employees who occupy administrative and executive positions do not need to be paid overtime. *See* 29 U.S.C. § 213(a)(1).  An employee in an administrative capacity is one:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week ...;
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200.

The actual day-to-day job activities of the employee are relevant to determining whether the employee is exempt under the FLSA, not the labels the employee or the employer places on those duties. *See, e.g., Tyler v. Union Oil Co. of Calif.,* 304 F.3d 379, 404 (5th Cir. 2002); *Kohl v. Woodlands Fire Department,* 440 F.Supp. 2d 626, 637 (S.D. Tex. 2006); *Schaefer v. Ind. Mich. Power Co.,* 358 F.3d 394, 400 (6th Cir. 2004); 29 C.F.R § 541.2. "The essence of the test is to determine the employee's chief or principal duty .... The employee's primary duty will usually be what she does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time." *Dalheim v. KDFW-TV,* 918 F.2d 1220, 1227 (5th Cir. 1990) (internal citations omitted). However, if such employees are closely supervised and earn little more than the nonexempt employees, they generally do not satisfy the primary duty requirement. 29 C.F.R. § 541.700(c).

"Time is not the sole test, and employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." 29 C.F.R. 541.700(b). The fact that an employee spends 65 to 90 percent of his time on nonexempt tasks "is not a controlling factor under the regulations" for determining whether the employee was exempt from the FLSA's overtime. *Spinden v. GS Roofing Products Co., Inc.,* 94 F.3d 421, 427 (8th Cir. 1996); *Murray v. Stuckey's, Inc.,* 939 F.2d

614, 618 (8th Cir. 1991), *cert. denied,* 502 U.S. 1073 (1992); *Baldwin v. Trailer Inns, Inc.,* 266 F.3d 1104, 1113 (9th Cir. 2001). That the majority of an employee's time "was not spent [on exempt tasks] ... does not preclude the determination that [his] primary duties consisted of the administration of the general business operations ... such that the administrative and supervisory duties performed by [the employee] were of principal importance to [the employer], as opposed to those collateral tasks which may have taken more than fifty percent of [his] time." *Lott v. Howard Wilson Chrysler-Plymouth, Inc.,* 203 F.3d 326, 332 (5th Cir. 2000).

In order to qualify for the administrative exemption, an employee's primary duty must be "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). Thus, where an employee is primarily involved in producing the product of the company rather than "servicing" the company, the administrative exemption does not apply. "Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as ... accounting; budgeting; auditing; ... quality control; purchasing; procurement; ... safety and health; personnel management; human resources; ... government relations ... legal and regulatory compliance; and similar activities." 29 C.F.R. § 541.201(b).

In promulgating the 2004 FLSA regulations, however, the Department of Labor explained that the distinction between production and administrative tasks is but one factor in the ultimate analysis of whether the employee's work is directly related to general business operations. Department of Labor, Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees; Final Rule, 69 Fed. Reg. 22121, 22141 (April 23, 2004) (citing *Bothell v. Phase Metrics, Inc.,* 299 F.3d 1120, 1127 (9th

Cir. 2002)). Department of Labor regulations provide several factors to consider in determining whether the employee at issue exercised independent discretion and judgment:

1.    whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices;

2.    whether the employee carries out major assignments in conducting the operations of the business;

3.    whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;

4.    whether the employee has authority to commit the employer in matters that have significant financial impact;

5.    whether the employee has authority to waive or deviate from established policies and procedures without prior approval;

6.    whether the employee has authority to negotiate and bind the company on significant matters;

7.    whether the employee investigates and resolves matters of significance on behalf of management;

8.    and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R 541.202(b).

Federal courts generally find that employees who meet at least two or three of these factors are exercising discretion and independent judgment, although a case-by-case analysis is required. *See McKee v. CBF Corp.*, No. 08-10321, 2008 WL 4910671, *3 (5th Cir. Nov. 17, 2008) (upholding administrative exemption where employee supervised five others, screened employees for hire, decided which of a list of tasks would be handled by outside contractors, and ordered alcohol totaling over $500,000 per year); *Bondy v. City of Dallas*, 2003 WL 22316855, *2 (5th Cir. 2003) (upholding administrative exemption where event coordinators decided whether a client's proposal complied with policies and procedures, recommended that management excuse the noncompliance, and made suggestions to revise policies and procedures); *Cowart v. Ingalls Shipbuilding, Inc.*, 213 F.3d 261, 267 (5th Cir. 2000) (upholding administrative exemption where employees planned in detail all production work requirements in

the shipyard, ensured that craft workers had adequate information, established priorities for assigned work, and provided guidance to finish work on schedule).[18] *Cf Heidtman*, 171 F.3d at 1042 (reversing finding of administrative exemption where employees spent considerable time compiling names of prospects to complete their databases, calling prospects in these databases, sending them brochures, and the employees required permission to take potential clients out to a meal), *Roberts v. National Autotech, Inc.*, 192 F.Supp.2d 672, 679 (N.D. Tex. 2002) (holding employee's duties did not fall within administrative exemption where plaintiff handled customer complaints, ensured the store was running properly and profitably, scheduled employees, and oversaw daily operations, but could not grant vacation requests, deviate from normal refund procedures, or resolve serious internal disputes). In addition, final decision-making authority over matters of consequence is unnecessary. *See, e.g.*, *Tyler v. Union Oil Co. of California*, 304 F.3d at 403.

An employee may exercise discretion even if his decisions or recommendations are reviewed by a senior management official and occasionally revised or reversed. *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 585 (5th Cir. 2006); 29 C.F.R. § 541.202(c). In addition, employees may still exercise discretion and independent judgment even if they consult manuals or guidelines. *Id.* at 585.

Other district courts that have considered the issue have found that the administrative exemption applies to pharmaceutical sales representatives. In *Amendola v. Bristol Myers Squibb Company*, the district court considered whether a drug company's representatives who promoted the company's products to doctors in the field were covered by the administrative exemption.

---

[18] *See also, Haywood v. North American Van Lines, Inc.*, 121 F.3d 1066, 1071-73 (7th Cir. 1997) (upholding administrative exemption where employee could negotiate on behalf of the employer with some degree of settlement authority, conduct independent investigation and resolution of issues without prior approval, and had the authority to waive or deviate from established policies and procedures without prior approval).

558 F.Supp.2d 459, 476 (S.D.N.Y. 2008).  In describing the representative's status under the first

prong of the exemption, the district court stated that:

> BMS has shown that its PRs perform non-manual work directly related to the general
> business operations of the company.  Each PR represents BMS in meetings with medical
> providers and promotes BMS drugs.  The success of BMS's business depends in part on
> the success of its PRs in educating physicians about BMS drugs.  Thus, the nature of the
> work performed by PRs is directly related to BMS's management or business operations.

*Id.* at 476-477.  The district court then found that the defendant was likely to satisfy the second

prong of the administrative exemption as well.  In deciding that the company's representatives

exercised the discretion and independent judgment required by the statute, the district court

considered the fact that the representatives tailor the content of their presentations to each

medical provider based on the provider's patient populations, prescription practices, and other

factors, and independently decide what promotional message will be most effective.   The

representatives decide whether to seek a "commitment" from a physician, and they each manage

their call lists, exercising their own judgment in deciding how often to visit a doctor and whether

to add new providers to their lists.  They also determine how to manage their own promotional

budgets.  "Each of these daily acts reflects 'the evaluation of possible courses of conduct, and

acting or making a decision after the various possibilities have been considered,' and each of

these decisions is made 'free from immediate direction or supervision.'" *Id.* at 477.  The district

court concluded that "these areas of discretion and independent judgment involve 'matters of

significance' because, in making each of these decisions, PRs seek to influence prescription

writing practices—a matter of great consequence to BMS's business." *Id.*

The District of New Jersey then followed the *Amendola* court in finding that

pharmaceutical representatives should be classified as administrative workers for the purposes of

FLSA. *Smith v. Johnson and Johnson*, No. 06-4787, 2008 WL 5427802, at *10-12 (D.N.J. Dec.

30 2008).   In *Smith*, the company's representatives had slightly less autonomy then the representatives in *Amendola*, largely because, like Plaintiffs in the instant case, they could not, on their own initiative, choose to see new physicians in order to increase the number of prescriptions written.  Despite this difference, the *Smith* court still found that the representatives performed tasks sufficiently within the scope of the administrative exemption regulations. "Plaintiff's promotion and marketing of [the drug] to physicians is an example of the kind of role that, while it does not dictate corporate marketing policy, actually drives the market demand, and therefore substantially affects operation of 'a particular segment of the business.'" 2008 WL 5427802 at *10 (citation omitted).  The *Smith* plaintiff was similar enough to the representatives in *Amendola* with respect to the "general nature of the work she performed, the lack of day-to-day supervision from her manager (who accompanied her only monthly), and the manner in which she sought to have an impact on growing the market share of [the drug] in her territory, clearly a matter of importance to [the Defendant]." *Id.* at *11.

In *In re Novartis Wage and Hour Litigation*, 593 F.Supp.2d 637, 641 (S.D.N.Y. 2009), the plaintiffs were pharmaceutical representatives whose primary function was to call on physicians and give them information about the defendant company's drugs.  As in the instant case, since the drugs were regulated by the FDA, the defendant prepared scripts and related materials for the representatives to use when delivering a "core message" about the defendant's products to physicians.  The representatives were not allowed to go beyond the boundaries of the message created by defendant.  The defendant also provided the representatives with drug samples, pamphlets, clinical studies, visual aids, and other materials, and instructed the representatives on how to use these materials during their visits.  The representatives had the discretion as to when and how to use these materials, however, and they planned their daily call

schedules and decided when to visit the doctors on their target list. The defendant set parameters for the representatives to tailor presentations to each physician based on such variables as the amount of time the physician allocates to meeting with the representative, their prescribing habits, and the representatives assessment of the physician's personality. Representatives were also given budgets and allowed to plan speaker events within certain guidelines created by the defendant. 593 F.Supp.2d at 641-642. Citing *Amendola*, the district court found that the defendant had satisfied the first prong of the exemption, because the representatives performed non-manual work and because "[their] success in obtaining prescriptions is critical to [the defendant's] business. *Id.* at 656.

The *In re Novartis* court also found that the defendant had satisfied the second prong of the exemption because its representatives were allowed to exercise considerable discretion in carrying out their duties. In response to the plaintiff's arguments that they were "robots" or "automatons" with no room to act with discretion or independent judgment within the stringent confines of the defendant's regulations, the district court stated: "[a]t the bare minimum, [representatives] must be capable of tailoring their presentation to a given timeframe—deciding how best to convey the 'core message' in a manner that will have the desired effect on the physician. Such a decision involves making an independent judgment, free of direct oversight, even if [the defendant] has provided [the representatives] with guidelines for conveying certain information in a certain manner." *Id.* at 657.

Although the facts of these cases are overwhelmingly similar to those before the Court, Plaintiffs make no effort to distinguish them. In the only case Plaintiffs cite in support of their position, *Ruggeri v. Boehringer Ingelheim Pharmaceuticals, Inc.*, the district court recognized "it was at least a possible conclusion" for jurors to find that the administrative workers exemption